620      441 Mass. 620 (2004)

Chief Justice for Admin. & Mgt. *v.* Office & Professional Employees International Union, Local 6.

## Chief Justice for Administration and Management of the Trial Court *vs.* Office and Professional Employees International Union, Local 6, AFL-CIO.

Suffolk. February 2, 2004. - May 10, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Chief Justice for Administration and Management. Court Reporter. Arbitration,* Authority of arbitrator, Collective bargaining. *Public Employment,* Collective bargaining, Transfer. *Statute,* Construction.

This court concluded that an arbitrator did not exceed his authority in ruling that the permanent involuntary reassignment of court reporters was subject to the procedure outlined in a collective bargaining agreement between the Chief Justice for Administration and Management of the Trial Court (CJAM) and the union representing office and professional employees of that court, where there was no material conflict between the CJAM's power under G. L. c. 211B, §§ 9 and 10, temporarily to transfer employees and terms of the collective bargaining agreement as to the procedure for making permanent transfers. [623-631]

Civil action commenced in the Superior Court Department on October 15, 2001.

A motion for reconsideration of recusal and to report the case to the Appeals Court was heard by *Janet L. Sanders,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jean Strauten Driscoll* for the plaintiff.

*Robert S. Manning* for the defendant.

Spina, J. This action under G. L. c. 150C, § 11, seeks to vacate the award of an arbitrator, who found that the permanent involuntary transfer of a longtime Superior Court stenographer from Brockton to Dedham violated the collective bargaining agreement between the Chief Justice for Administration and Management of the Trial Court (CJAM) and the Office and Professional Employees International Union, Local 6, AFL-CIO

(union). The arbitrator ordered that the court reporter[1] be allowed to return to Brockton. He also awarded her mileage reimbursement for each day she worked in Dedham, starting February 7, 2000.

The CJAM filed a petition under G. L. c. 150C, § 11, to vacate the award, claiming the arbitrator exceeded his authority by interfering with the orderly administration of the functions of the Superior Court department and the statutory authority of the Justices of the Superior Court to assign court reporters to perform services in any county. See G. L. c. 221, § 82. The union filed a counterclaim to confirm the award. Both parties filed motions for summary judgment. After a hearing, the Superior Court judge recused herself and requested that a judge from another Trial Court Department be specially assigned to hear the matter. The parties then filed a joint motion for reconsideration and to reserve and report the case to the Appeals Court, whereupon the judge reported the case without decision. See Mass. R. Civ. P. 64 (a), as amended, 423 Mass. 1403 (1996). We transferred the case on our own motion. Because we conclude the arbitrator did not exceed his authority, we confirm the award.

1. *Facts.* The parties agreed to a joint statement of the material facts, which they stipulated are all that are needed for resolution of this case. However, to clarify certain points, we include undisputed facts from the arbitrator's opinion. See *School Comm. of Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 754 (2003).

The CJAM is the employer for all employees of the Trial Court, including court reporters. By statutory authority, the CJAM has the power to establish "system wide personnel policies and hiring practices" and to act as collective bargaining agent on behalf of the Trial Court. See G. L. c. 211B, § 9 (iv). See also G. L. c. 150E, § 1.[2] The union is the exclusive collec-

---

[1] The "title of court reporter may be used by or to designate any stenographer" of the Superior Court. See G. L. c. 221, § 82. See also G. L. c. 221, § 91D.

[2] General Laws c. 150E, § 1, vests such authority in the "chief administrative justice of the trial court," who is now known as the Chief Justice for Administration and Management (CJAM).

tive bargaining representative of a unit of administrative and clerical employees of the Trial Court, including court reporters. The CJAM and the union are parties to a collective bargaining agreement that was in full force and effect at all times relevant to this case.

In June, 1993, Kathleen Lindelof was appointed as a permanent court reporter to the Plymouth Superior Court in Brockton.[3] By early 2000, she was one of two senior court reporters working in Brockton. For approximately ten days between the middle of January and February 4, 2000, Lindelof was temporarily assigned to court houses in Fall River and Dedham.[4] On February 5, 2000, Lindelof was permanently reassigned to the Norfolk Superior Court in Dedham.[5] Nine days later she filed a grievance, claiming that both the temporary and permanent transfers violated art. XXII of the agreement.

Section 22.01 of art. XXII of the agreement provides: "When the qualifications, such as training, skill, ability, and other relevant qualities are considered relatively equal by the Employer, the Employer shall transfer or make shift assignments in accordance with the following procedure: 1. The Employer shall ask for volunteers first. 2. If more than one employee volunteers, the employee having the most seniority shall be chosen. 3. If there are no volunteers, the Employer shall make work assignments according to seniority with the junior employee being subject to transfer or shift assignment."

Lindelof's grievance was denied at all levels of the agree-

---

[3]Kathleen Lindelof previously had worked as a "per diem" (independent contractor) court reporter in Brockton from 1978 to 1993. Her permanent appointment to Brockton was approved by the CJAM in a letter to the Chief Justice of the Superior Court.

[4]Fall River is in Bristol County and Dedham is in Norfolk County. Although Lindelof lived in Norfolk County, her home was closer to the court house in Brockton than the one in Dedham.

[5]The Chief Justice of the Superior Court, who transferred Lindelof to Norfolk County, testified that a shortage of permanent court reporters in Dedham necessitated the transfer. The Chief Justice did not consult the terms of the agreement before deciding which reporter to reassign to Dedham, nor did she first ask for volunteers from the pool of reporters permanently assigned to Brockton. Lindelof was chosen from the Brockton group, according to the Chief Justice, because she lived in Norfolk County.

441 Mass. 620 (2004)                                    623

Chief Justice for Admin. & Mgt. *v.* Office & Professional Employees International Union, Local 6.

ment's grievance procedure.[6] The union then filed a demand to arbitrate the grievance. On September 14, 2001, a mutually selected arbitrator issued an opinion and award, finding that "the Employer"[7] did not violate the agreement by temporarily transferring Lindelof from Brockton to Dedham.[8] The arbitrator found that her permanent reassignment to Dedham, however, did violate the contract. As previously noted, he ordered that Lindelof be allowed to return to Brockton at the commencement of the next assignment period. Deeming the time she spent in Dedham to be a "temporary" assignment, the arbitrator also awarded Lindelof mileage reimbursement (as provided by art. XII of the agreement) for each day she commuted to Dedham.[9] Pending the litigation, Lindelof remained in Dedham and received no mileage reimbursement.

2. *Discussion.* Although the parties agreed to four issues in this case,[10] they can be reduced to a single question: Did the

[6]The grievance procedure as outlined in the agreement called for a series of four steps, beginning with submission of the grievance to the employee's immediate manager, then to the Chief Justice, then to the director of human resources (who works in the office of the CJAM), and finally to arbitration. The record is silent as to whether Lindelof appealed from the Chief Justice's decision to the CJAM, as permitted by G. L. c. 211B, § 10 (i).

[7]The "employer" referred to in the arbitrator's opinion is the CJAM, who, as authorized collective bargaining agent for the Trial Court, is party to the agreement, although the Chief Justice of the Superior Court was the one who actually reassigned Lindelof. See note 5, *supra.* The Superior Court judge who recused herself from the case noted that, while the CJAM is the plaintiff, "the real party in interest here" is the Chief Justice of the Superior Court, because "it is her power and authority which is at stake."

[8]The union does not dispute this finding on appeal.

[9]Section 12.04 of art. XII of the agreement states: "Employees assigned temporarily to work at a location other than their regularly assigned work location will be reimbursed at the mileage reimbursement rate in effect per . . . above [i.e., twenty-seven cents a mile] when using their personal vehicle to commute to and from the temporary work location . . . ."

[10]The issues are: "1. Did the arbitrator act within his authority by finding that the CJAM violated the Agreement's transfer provision with respect to a court reporter's involuntary permanent transfer? 2. Did the CJAM have the authority to enter into a collective-bargaining agreement with the [u]nion governing the assignment or transfer of court reporters? 3. Did the CJAM have the authority under G. L. c. 211B to enter into an Agreement with the [u]nion that restricts the [G. L.] c. 221, § 82[,] authority of the justices of the Superior Court Department to involuntarily assign or transfer court reporters to another courthouse? 4. Is Lindelof entitled to interest on her mileage

arbitrator exceed his authority in ruling that the permanent reassignment of court reporters is subject to the procedure outlined in the collective bargaining agreement, notwithstanding the statutory powers of the Chief Justice of the Superior Court and the CJAM to transfer such employees as needed? See G. L. c. 150C, § 11 (a) (3) (requiring arbitration award be vacated if arbitrator exceeded powers). The power and authority of the Superior Court, its Chief Justice, and the CJAM derive from G. L. c. 221, § 82, and from G. L. c. 211B. We begin our discussion by setting forth the relevant statutory provisions.

General Laws c. 221, § 82, provides, in pertinent part: "The justices of the superior court shall appoint from time to time such official stenographers . . . for the several counties as the business of the court may require. Official . . . stenographers shall be sworn officers of the court, removable at the pleasure of the justices, may be appointed for more than one county, and shall perform such services in the county or counties for which they are appointed or in any other county, as may be assigned them by the justices or by their authority."[11] Under G. L. c. 211B, § 10 (i), the Chief Justice of a Trial Court (in this case, the Superior Court) has "[t]he power to appoint, discipline, evaluate, *transfer* and define the duties of all nonjudicial personnel within his department including . . . court reporters" (emphasis added). Section 10 (i) goes on to provide that "[a]ny person aggrieved by any decision of a chief justice under this paragraph may appeal such decision to the [CJAM]." Section 10 (v) states:

> "[The Chief Justice] notwithstanding any general or special law to the contrary, when necessary to ensure the proper administration of justice, [may] transfer employees

reimbursement for each day she has worked in Dedham until she is returned to Brockton?" The answers to these questions are subsumed in our discussion, *infra*, so we need not answer them separately. See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 199-200 n.5 (1982).

[11]The purpose of St. 1870, c. 312 (the original version of G. L. c. 221, § 82), was "to afford assistance to the court and the counsel in conducting the trial, and in drawing up reports and bills of exceptions; not that a complete record of all that took place in the court below, whether material or immaterial to the understanding of the questions of law reserved, should be transmitted to this court." *Churchill* v. *Palmer*, 115 Mass. 310, 314 (1874).

441 Mass. 620 (2004) 625

Chief Justice for Admin. & Mgt. v. Office & Professional Employees International Union, Local 6.

of his department to serve where needed . . . provided, however, that said chief justice may, upon reasonable notice, *temporarily* transfer nonjudicial personnel within his department, divisions and places for holding court, and in no event shall any such transfer be more than a reasonable distance from the place where such personnel is employed unless the employee so transferred shall consent thereto; provided, further, that such transfer of the employee shall not be for more than ninety days, but such transfer may be extended for three consecutive ninety-day periods, provided that notice is given to the house and senate committees on ways and means upon each extension, including the employee's position, duties, and reason for the transfer, but such transfer shall not exceed three hundred and sixty consecutive days" (emphasis added).

Finally, G. L. c. 211B, § 9 (xxii), provides that the CJAM, like a Trial Court Chief Justice, also may "transfer employees of the trial court to serve where needed," subject to the same proviso, quoted above, that applies to a Chief Justice of the Trial Court.[12]

General Laws c. 150E, § 7 (*d*), the so-called "conflicts" section of the public employee labor relations statute, provides that, if a collective bargaining agreement conflicts with any one of several enumerated statutory provisions, then the terms of the agreement prevail.[13] "[S]tatutes not specifically enumerated in § 7 (*d*) will prevail over contrary terms in collective bargaining agreements." *Commonwealth* v. *Labor Relations Comm'n*, 404

---

[12]In this case, the CJAM did not actually transfer Lindelof but rather permitted it.

[13]Before G. L. c. 150E, § 7, took effect in 1974, St. 1973, c. 1078, §§ 2, 7, any part or provision of a collective bargaining agreement that conflicted with any law, ordinance, or bylaw was invalid under G. L. c. 149, § 178I. See *School Comm. of Braintree* v. *Raymond*, 369 Mass. 686, 688-689 (1976), citing *Chief of Police of Westford* v. *Westford*, 365 Mass. 526, 528 n.1 (1974). A Legislative Research Council Report Relative to Collective Bargaining and Local Government Employees, 1969 House Doc. No. 4746, noted that this was an area "of deep concern" to labor, and one that engendered "frustration and bitterness." *Id.* at 13, 37. According to the report, labor "would like to make the agreements valid, regardless of previous statutes," such that "bargaining agreements should supersede all statutes." *Id.* at 13, 38. The inclusion in G. L. c. 150E, § 7, of certain statutes that yield to conflicting terms in collective bargaining agreements seems to reflect an attempt by the Legislature to compromise on this issue. See *Sullivan* v. *Belmont*, 7 Mass. App. Ct. 214, 217-218 (1979).

Mass. 124, 126 (1989), citing *Burlington* v. *Labor Relations Comm'n*, 390 Mass. 157, 163 (1983). See *School Comm. of Natick* v. *Education Ass'n of Natick*, 423 Mass. 34, 39 (1996). Among the statutory sections *not* listed in G. L. c. 150E, § 7 (*d*), are G. L. c. 221, § 82, and G. L. c. 211B, §§ 9-10. The provisions of these sections, therefore, override any conflicting provisions of the collective bargaining agreement. See *Bruno* v. *Chief Admin. Justice of the Trial Court*, 380 Mass. 128, 131 (1980). See also *Berkshire Hills Regional Sch. Dist. Comm.* v. *Berkshire Hills Educ. Ass'n*, 375 Mass. 522, 527 (1978).

This language appears purposely omitted from G. L. c. 150E, § 7 (*d*). Section 7 (*d*) does include G. L. c. 221, §§ 69-73, 75, 80, and 89 (applicable to court officers, deputy sheriffs, constables, and clerical assistants), but it passes directly over § 82, which pertains to court reporters. As for G. L. c. 211B, only § 8, which establishes an advisory committee on personnel standards, is listed in G. L. c. 150E, § 7. Section 8 requires the CJAM to "establish and promulgate standards for the appointment, performance, promotion, continuing education and removal of all personnel within the trial court, except judges, clerks and registers of probate," and requires that appointments comply with those promulgated standards. It says nothing about the transfer, temporary or otherwise, of such personnel, and therefore is immaterial to that aspect of the authority of either the CJAM or the Chief Justice of the Superior Court.

The union argues that the CJAM negotiated and entered into a valid three-year agreement that binds the employer into a seniority-based procedure for transferring court reporters. See G. L. c. 211B, § 9 (iv). The CJAM, however, contends that he had no authority to bargain away the power vested in the Superior Court by G. L. c. 221, § 82, to appoint and assign stenographers. See *Chief of Police of Dracut* v. *Dracut*, 357 Mass. 492, 502 (1970). The union counters that to the extent G. L. c. 221, § 82, which was enacted in 1927 (St. 1927, c. 332, § 1), conflicts with G. L. c. 211B, §§ 9-10, enacted in 1978 (St. 1978, c. 478, § 110), the more recent (and more specific) statute prevails. See *Doe* v. *Attorney Gen. (No. 1)*, 425 Mass. 210, 215 (1997) (new provision is more recent expression of Legislature's intent). Moreover, because G. L. c. 211B, § 10,

entitles an employee aggrieved by a transfer decision by the Chief Justice to appeal from the decision to the CJAM, the union asserts that "any perceived power to transfer court reporters under G. L. c. 221, § 82, gives way to the power of the CJAM to oversee and bind under a collective-bargaining agreement."[14]

"All the statutes must be construed, where capable, so as to constitute a harmonious whole consistent with the legislative purpose disclosed in the new act. Such purpose is to be gleaned from the reasons, where ascertainable, leading to the legislation, from the nature of the subject matter, from the supposed evil to be corrected, and from the objective sought to be attained." *Chief of Police of Dracut* v. *Dracut, supra* at 499, quoting *Mathewson* v. *Contributory Retirement Appeal Bd.,* 335 Mass. 610, 614-615 (1957). Chapter 211B, part of the Court Reorganization Act of 1978, created a "trial court of the commonwealth," of which the "chief administrative justice" (now called the CJAM) became the "administrative head." St. 1978, c. 478, § 110. See *Bruno* v. *Chief Admin. Justice of the Trial Court, supra* at 130.

> "A major feature of the Court Reorganization Act, in order 'to promote the orderly and effective administration of the judicial system of the commonwealth,' was 'an administrative consolidation of the several courts of trial jurisdiction, so as to encourage a broader availability of personnel and other resources for the hearing of all causes on an equitable basis by the several justices of the trial court, so-called.' . . . What were previously separate trial courts became 'departments' and 'divisions' of departments. General Laws c. 211B, § 9, provides for the assignment of a justice in one department to sit in any other department. *Vital to the scheme is the further provision of § 9 for the assignment of nonjudicial personnel*

---

[14]The union also argues that because under G. L. c. 211B, § 9 (iv), the CJAM has the responsibility "consistent with" G. L. c. 211B, § 8, to provide personnel management, and § 8 is listed under G. L. c. 150E, § 7, the authority of the CJAM is therefore subordinate to the collective bargaining agreement. In light of our conclusion, we need not decide the issue. We note, however, that the specific statutory authority of the CJAM for transferring employees under G. L. c. 211B, § 9 (xxii), does not track § 8.

*among the various departments, divisions or places for
holding court. If transfers of judges are to accomplish
their purpose, it seems obvious that essential supporting
personnel must be made available"* (emphasis added).

*Id.* at 129-130. See *Clerk of the Superior Court for the County
of Middlesex* v. *Treasurer & Receiver Gen.*, 386 Mass. 517, 522
(1982) ("The thrust of the statute is toward consolidation, not
separation; toward conformity, not diversity"). Although arcane
by comparison, G. L. c. 221, § 82, states that stenographers
shall be appointed "as the business of the court may require,"
and further that they "shall perform such services in the county
or counties for which they are appointed *or in any other county,*
as may be assigned them by the justices *or by their authority"*
(emphasis added). Of course, § 82 must be construed consis-
tently with G. L. c. 211B, §§ 9 (iv) and 10 (i) and (v); indeed,
any power vested in the Superior Court is subject to the higher
authority of the CJAM.

Read together, we think these statutes evidence a long-
standing legislative intent to commit to the court or its author-
ity, i.e., the Chief Justices and the CJAM, an exclusive manage-
rial prerogative over the assignment and transfer of court
reporters. See *Berkshire Hills Regional Sch. Dist. Comm.* v.
*Berkshire Hills Educ. Ass'n, supra* at 525-527. This managerial
prerogative, however, is not unfettered. See *School Comm. of
Pittsfield* v. *United Educators of Pittsfield*, 438 Mass. 753, 760-
761 (2003). General Laws c. 211B, §§ 10 (v) and 9 (xxii),
make it clear that the Chief Justices may only "temporarily
transfer" such employees, subject to several specific conditions
and requirements, e.g., such transfer may not exceed 360
consecutive days.[15] Because G. L. c. 211B, §§ 9-10, are not

---

[15]Indeed, the legislative history of St. 1992, c. 379, §§ 77 and 79, which
rewrote G. L. c. 211B, §§ 9 and 10, indicates that the Senate opposed grant-
ing the chief justices power to make permanent transfers. The Senate rejected
a proposed amendment to the bill, 1992 House Doc. No. 6232 (incorporating
the text of 1992 Senate Doc. No. 1783), which would have provided that if
the transfer of a court employee by either the CJAM or a trial court chief
justice was effective for more than thirty days, "such employee's position
shall be deemed transferred," with notice to be given to the House and Senate
Committees on Ways and Means. See 1992 Senate J. 1580.

listed under G. L. c. 150E, § 7, they would prevail over any contrary term in the agreement. No provision of the agreement, however, conflicts with that authority; on the contrary, § 22.02 of the agreement states that "[t]ransfers subject to G. L. c. 211B [i.e., temporary transfers] will continue to be administered in accordance with that statute."[16]

As to the permanent transfer of court reporters, however, §§ 9-10 of G. L. c. 211B are silent. Under G. L. c. 150E, § 2, public employees have the right "to form, join, or assist any employee organization for the purpose of bargaining collectively through representatives of their own choosing on questions of wages, hours, *and other terms and conditions of employment*" (emphasis added). See G. L. c. 150E, § 6 (collective bargaining agreement may cover "wages, hours, standards or productivity and performance, and any other terms and conditions of employment"). If the bargained-for terms and conditions conflict with a statute, the agreement must yield if that statute is not listed under G. L. c. 150E, § 7 (*d*). See *School Comm. of W. Springfield* v. *Korbut*, 373 Mass. 788, 793 & n.9 (1977). As previously noted, §§ 9 and 10 are not listed under G. L. c. 150E, § 7 (*d*). However, we discern no "material conflict" between the employer's statutory power temporarily to transfer employees, and terms of the agreement as to the procedure for making permanent transfers. See *Leominster* v. *International Bhd. of Police Officers, Local 338*, 33 Mass. App. Ct. 121, 124-125 (1992), and cases cited.

Although the CJAM may not surrender his authority to transfer employees, "there is no reason why [the CJAM] may not bind [himself] to follow certain procedures precedent to the making of any such decision." *School Comm. of Danvers* v. *Tyman*, 372 Mass. 106, 113 (1977). See *School Comm. of W. Springfield* v. *Korbut, supra* at 795-796. If we accept the CJAM's argument that he lacked authority so to bargain, it would mean that Chief Justices (including the CJAM) could temporarily transfer court reporters subject to the restrictions set out in §§ 9 and 10, but that under G. L. c. 221, § 82, Superior

---

[16]In addition, § 5.04 of the collective bargaining agreement states: "The arbitrator shall have no power to . . . issue any decision or award inconsistent with applicable law."

Court justices could permanently reassign court reporters — a decision that has a much greater impact than a temporary transfer — without restrictions. We doubt this is the intent of the Legislature. The broad powers of the CJAM under G. L. c. 211, § 9, absorb the power to the justices of the Superior Court granted by G. L. c. 221, § 82.

There is no claim that the arbitrator's decision violated public policy. See *School Comm. of Hanover* v. *Curry*, 369 Mass. 683, 685 (1976). On the contrary, this Commonwealth has a "strong public policy favoring collective bargaining between the public employers and employees over the conditions and terms of employment." *School Comm. of Pittsfield* v. *United Educators of Pittsfield, supra* at 761-762. We conclude that the procedure for involuntarily transferring employees permanently was a proper subject for collective bargaining and thus governed by the binding arbitration provisions of the agreement. See *id.* at 764.

3. *Conclusion.* The arbitrator did not exceed his authority in finding that the CJAM violated the terms of the agreement. His decision that Lindelof be allowed to return to the Superior Court in Brockton and be reimbursed for her mileage is an appropriate remedy, given that the involuntary permanent transfer took place without observance of the procedures prescribed by the collective bargaining agreement.[17] See *School Comm. of W. Springfield* v. *Korbut, supra* at 793. As there is no indication that Lindelof submitted vouchers or other evidence of a sum owed that was wrongfully denied, thereby constituting a

---

[17]While we agree that the contractual procedures for involuntary permanent transfer were not followed here, we reject the arbitrator's view as expressed in his order and challenged by the CJAM that in the absence of a volunteer transferee, "the least senior reporter statewide" must be transferred to Dedham. The critically important management prerogative of deciding which courts are understaffed and which have available resources that could be used to staff them has not been relinquished in the collective bargaining agreement. Once the Chief Justice determined that a reporter could be spared from Brockton on a permanent basis for use in Dedham, the pool to which the collective bargaining agreement applied were those reporters in Brockton. In the absence of a volunteer from that court, the least senior reporter there would be transferred to Dedham.

"breach," see G. L. c. 231, § 6C, she is not entitled to interest on her award. The decision of the arbitrator is confirmed.[18]

*So ordered.*

---

[18]We are constrained to address an extraneous comment in the arbitrator's decision which, while not necessary to his decision, may nevertheless have an impact on current practice or future collective bargaining agreements. The comment is as follows: "What should have happened at the end of January was that the established assignment procedure should have been followed. The three permanent reporters in Brockton should have been allowed to exercise their seniority rights in choosing from among the three remaining sessions." The arbitrator is referring to a procedure known as "banking" (a term that does not appear in the record), whereby court reporters choose a court session based on seniority with the expectation that the chosen session will likely produce the need for a transcript for appellate purposes. Court reporters with the most seniority build up a backlog of such work and consequently an increased opportunity for greater income. This practice frequently causes delays in the preparation of transcripts. Inordinate delays in the appellate process may interfere with the due process rights of a criminal defendant, see *Commonwealth* v. *Weichel,* 403 Mass. 103, 108-109 (1988), and cases cited, as well as the constitutional duty of the appellate courts. While, by contrast, seniority has a place in the assignment of court reporters to court locations, it has no place in their assignment to court sessions. There is no provision in the collective bargaining agreement covering choice of session, and the need for the *prompt* preparation of trial transcripts, especially in criminal cases, must take precedence.